**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| BISCAYNE BAY WATERKEEPER, INC. d/b/a MIAMI WATERKEEPER, <br><br> Plaintiff, <br><br> v. <br><br> K.L. BRITO CORPORATION, <br><br> Defendant. | Civil Case No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

Plaintiff Biscayne Bay Waterkeeper, Inc. d/b/a Miami Waterkeeper ("Miami Waterkeeper"), by and through its counsel, hereby alleges:

**I.**

**INTRODUCTION**

1. This is a civil suit brought under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387, commonly known as the Clean Water Act ("CWA" or "the Act"), to address and abate Defendant's ongoing and continuous violations of the Act pursuant to the Act's citizen suit enforcement provisions at CWA Section 505, 33 U.S.C. § 1365.

2. Defendant discharges polluted storm water runoff from its two motor vehicle parts reclaiming/distribution facilities in Opa-locka (the "Facility") into the waters of the United States without authorization, in violation of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and has failed to obtain coverage under and does not comply with the conditions of an individual National Pollutant Discharge Elimination System ("NPDES") permit

or the Multi-Sector Generic Permit for Stormwater Discharge Associated with Industrial Activity ("MSGP") issued by Florida's Department of Environmental Protection ("DEP"), in violation of CWA Section 402(p), 33 U.S.C. §§ 1342(p), and 40 C.F.R. §§ 122.26(c)(1) and (e)(1).

3. Stormwater runoff is one of the most significant sources of water pollution in the nation. Stormwater picks up industrial pollutants and typically discharges them directly into nearby waterbodies or indirectly via storm sewer systems. Discharge of stormwater from areas where industrial activities occur can contain toxic pollutants when facility practices allow exposure of industrial materials to stormwater. This increased flow and pollutant load can impair waterbodies, degrade biological habitats, pollute drinking water sources, and cause flooding and hydrologic changes to the receiving water, such as channel erosion. In most of the Biscayne Bay watershed, storm water flows untreated either directly or through municipal storm drain systems into the Biscayne Bay and its tributaries. Stormwater pollution accounts for a significant amount of the pollution entering the Biscayne Bay watershed each year. Storm water pollution poses a health risk to humans, harms marine life, closes beaches, contaminates the ocean, and harms the environment.

4. Defendant's storm water discharges contribute to this storm water pollution problem. Defendant engages in industrial activities including the reclamation and distribution of used motor vehicle parts. As precipitation comes into contact with pollutants generated by these industrial activities, it conveys those pollutants to nearby surface waters. Contaminated storm water discharges from industrial operations such as Defendant's can and must be controlled to the fullest extent required by law in order to allow the Biscayne Bay watershed a fighting chance to regain its health.

II.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over the parties and this action pursuant to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

6. On June 30, 2023, Plaintiff provided notice of Defendant's violations of the Act and of its intention to file suit against Defendant to Defendant, Defendant's registered agent; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IV; the Secretary of DEP; and the Southeast District Director of DEP, as required by the Act under CWA Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3. A true and correct copy of Plaintiff's notice letter is attached as Exhibit A, and is incorporated herein by reference.

7. More than sixty days have passed since the notice letter was served on Defendant and the state and federal agencies. Plaintiff has complied with the Act's notice requirements under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

8. Neither the EPA nor the State of Florida has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this Complaint. *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

9. This action is not barred by any prior administrative penalty under CWA Section 309(g), 33 U.S.C. § 1319(g).

10. Venue is proper in the United States District Court for the Southern District of Florida pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because both the source of the violations complained of is located and the acts and omissions giving rise to the claims occurred, within this judicial district.

## III.

## PARTIES

11. Plaintiff Miami Waterkeeper is a Coral Gables-based non-profit corporation with members throughout Miami-Dade and Broward County. Miami Waterkeeper's mission is to ensure swimmable, drinkable, fishable water for all. To further its mission, Miami Waterkeeper actively seeks federal and state implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members. Miami Waterkeeper has been registered as a non-profit corporation in Florida since 2010 and has maintained its good and current standing in Florida since that time. Miami Waterkeeper is a licensed member of Waterkeeper Alliance, Inc., an international non-profit environmental organization, made up of over 360 separate Waterkeeper groups each representing a different waterway, such as Miami Waterkeeper.

12. Plaintiff's members use and enjoy the waters which Defendant has unlawfully polluted and is unlawfully polluting. Plaintiff's members use those waters for fishing, boating, body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation. Defendant's discharges of storm water associated with industrial activity containing pollutants impair each of those uses. Thus, the interests of Plaintiff's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA.

13. The relief sought herein will redress the harms to Plaintiff and its members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

14. Plaintiff brings this action on behalf of its members, respectively. Plaintiff's interest in reducing Defendant's discharges of pollutants into the Biscayne Bay Watershed and its tributaries and requiring Defendant to comply with the requirements of the CWA are germane to Plaintiff's organizational purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of the Plaintiff's nonprofit organization.

15. Plaintiff is informed and believes, and thereupon alleges, that Defendant K.L. Brito Corporation is a corporation incorporated under the laws of the State of Florida, which owns and/or operates the two facilities at issue in this Complaint.

## IV.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

16. Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a). In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

17. Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342. An NPDES permit requires dischargers of pollution to comply with various limitations.

18. NPDES permits are issued by the EPA or by states authorized by EPA to act as

NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA. CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

19. The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution. *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).

### Storm Water Permits

20. In 1987, to better regulate pollution conveyed by storm water runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

21. Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated storm water discharge regulations at 40 C.F.R. § 122.26.

22. In promulgating those regulations, EPA cited abundant data showing the harmful effects of storm water runoff on rivers, streams, and coastal areas across the nation. In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in storm water runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants. 55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

23. CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for storm water discharges "associated with industrial activity."

24. 40 C.F.R. § 122.26(c)(1) provides that dischargers of storm water associated with industrial activity must apply for an individual permit, apply for a permit through a group

application, or seek coverage under a general permit.

25. 40 C.F.R. § 122.26(b)(13) defines "storm water" to include storm water runoff, snow melt runoff, and surface runoff and drainage.

26. 40 C.F.R. § 122.26(b)(14) specifies that "storm water discharge associated with industrial activity" includes, *inter alia*, storm water discharge from facilities classified under Standard Industrial Classification ("SIC") code 5015. Facilities in that industrial category must obtain NPDES permit coverage for their storm water discharges.

### Florida's MSGP

27. Florida's Multi-Sector Generic Permit for Stormwater Discharge Associated with Industrial Activity is an NPDES permit that is issued by the DEP under the authority of Florida Statute Section 403.0885, which authorizes Florida to implement the NPDES program pursuant to authority delegated to the State of Florida by the EPA. Pursuant to Florida Administrative Code ("F.A.C.") Rule 62-621.300(5)(a), Florida adopted the EPA's original Multi-Sector General Permit issued on September 29, 1995 (60 Fed. Reg. 50804) and subsequent corrections and modifications as amended on February 9, 1996 (61 Fed. Reg. 5248); February 20, 1996 (61 Fed. Reg. 6412); August 7, 1998 (63 Fed. Reg. 42534); September 30, 1998 (63 Fed. Reg. 52430); and January 19, 1999 (64 Fed. Reg. 2898) (hereinafter collectively referred to as the "MSGP"). Thus, Florida has a single, statewide general permit applicable to all industrial storm water dischargers.

28. In order to discharge storm water lawfully in Florida, industrial dischargers must obtain coverage under and comply with the terms of the MSGP or obtain and comply with an individual NPDES permit. 33 U.S.C. § 1311(a).

29. The MSGP contains a variety of substantive and procedural requirements that all

dischargers must meet.

30. Part XI.M of the MSGP pertains to Sector M facilities. These are facilities that possess a SIC Code of 5015. Sector M facilities discharge storm water associated with industrial activity from automobile salvage yards. In addition to the general requirements that the MSGP imposes on all dischargers, Part XI.M of the MSGP imposes certain additional specific terms and conditions on Sector M Facilities.

31. The MSGP is built on the expectation that its requirements will predominantly be met through a permittee's use of best management practices ("BMPs"). BMPs can take a wide variety of forms; from frequent sweeping, making structural modifications such as roofing, or installing storm water filtration and treatment, as necessary.

32. The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution. *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311). In turn, the Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants (i.e. most pollutants), permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . ." 33 U.S.C. § 1311(b)(2)(A). The Act also sets a different standard, "application of the best conventional pollutant control technology" for a defined set of five "conventional pollutants." *Id*. § 1311(b)(2)(E).[1]

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40 CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

33. Accordingly, the MSGP requires permittees to use BMPs that reflect, and prohibit the discharge of pollutants above the level commensurate with, application of the best available technology economically achievable ("BAT"), for toxic and non-conventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. *See* 60 Fed. Reg. at 50812; *see also* MSGP § XI.M.2.a(3), 60 Fed Reg. at 51185.

34. The MSGP also requires dischargers to develop and implement a storm water pollution prevention plan ("SWPPP"). MSGP § IV. Among other things, the SWPPP records the BMPs applied at a particular industrial facility. Sector M Facilities must develop and implement a SWPPP that comports with several requirements of Part XI.M of the MSGP. Through the SWPPP, requirements in Part XI.M of the MSGP implement its BAT/BCT requirements for Sector M facilities by requiring that the pollution prevention plan minimize pollution and requiring specific BMPs to effectuate such minimization. *See* MSGP Fact Sheet § VI.B, 60 Fed. Reg. at 50812 ("The pollution prevention or BMP requirements in this permit operate as limitations on effluent discharges that reflect the application of BAT/BCT.").

35. The MSGP provides that: "[T]he plan shall describe and ensure the implementation of practices that are to be used to reduce the pollutants in storm water discharges associated with industrial activity at the facility and to assure compliance with the terms and conditions of this permit. Facilities must implement the provisions of the storm water pollution prevention plan required under this part as a condition of this permit." MSGP § IV, 60 Fed. Reg. at 51115.

36. Part XI.M.2.a(3) of the MSGP requires that Sector M facilities develop and implement appropriate storm water management controls that include BMPs designed to prevent or reduce the discharge of pollutants in storm water runoff. This includes, *inter alia*, good

housekeeping practices, preventive maintenance, spill and leak prevention and response procedures, inspections, employee training, sediment and erosion control measures, and measures designed to manage storm water runoff in order to reduce pollutants from storm water discharges.

37. For Sector M facilities, the MSGP establishes the following cut-off concentrations for pollutants of concern: total suspended solids ("TSS") – 100 mg/L, total recoverable aluminum – 0.75 mg/L, total recoverable iron – 1.0 mg/L, and total recoverable lead – 0.0816 mg/L. MSGP, § XI.N.5.a. The cut-off concentrations are used "to assess the effectiveness of the pollution prevention plan and to help ensure that a reduction of pollutants is realized." 60 Fed. Reg. at 50843 (Monitoring and Reporting Requirements). They "provide a reasonable target for controlling storm water contamination by pollution prevention plans." *Id.* at 51076.

38. The cut-off concentrations are guidelines for determining whether a facility has implemented the requisite BAT/BCT level of control measures. Further, exceedances of cut-off concentrations are reason for concern that pollution may have reached a level "at which a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish." 60 Fed. Reg. at 50824–25.

## CWA Citizen Enforcement Suits

39. Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

40. Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant

to CWA Section 402, 33 U.S.C. § 1342.  CWA Section 505(f), 33 U.S.C. § 1365(f).

41. Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

42. Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

43. Violators of the Clean Water Act are also subject to an assessment of civil penalties of up to $64,618 per day per violation. CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

## V.

## STATEMENT OF FACTS

### Automobile Salvage Yards

44. Automobile salvage yards include activities related to dismantling of used motor vehicles for the purpose of selling parts as well as the wholesale and retail distribution of used motor vehicle parts. Pollutants associated with automobile dismantling facilities involve a variety of harmful substances including but not limited to oil and grease, heavy metals, galvanized metals, petroleum hydrocarbons, suspended solids, arsenic, and acids. In addition, fork lifts, trucks, and other vehicles track debris, particulate matter, and other contaminants to areas on and off the premises. Vehicles also expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids. 60 Fed. Reg. 50804, 50945–46 (listing common pollutants associated with Sector M—automobile salvage yards—as of 1995).

### Defendant's Expired MSGP Coverage at the Palmetto Used Auto Parts Facility

45. Defendant owns and/or operates an automobile salvage yard which does business

as Palmetto Used Auto Parts and is located at 12720 Cairo Ln, Opa-locka, FL 33054 ("Palmetto Facility").

46. In 2005, Defendant sought permit coverage under the MSGP for its industrial storm water discharges at the Palmetto Facility.

47. The Facility ID for documents submitted to DEP for the Palmetto Facility was FLR05G063.

48. On its Notice of Intent to Use Multi-Sector Generic Permit for Stormwater Discharge Associated With Industrial Activity ("NOI"), signed by Defendant on July 8, 2005, K.L. Brito certified that the Facility is classified under SIC Code 5015.

49. The NOI stated that the Facility collects and discharges storm water through at least one discharge location (outfalls). Defendant certified that this outfall discharges to the Biscayne Canal.

50. In 2007, the DEP found that Defendant failed to conduct certain analytical monitoring of storm water discharges required by the MSGP at the Palmetto Facility and issued a Consent Order containing a monetary penalty against Defendant.

51. In 2010, the DEP again found that Defendant failed to conduct certain analytical monitoring of storm water discharges required by the MSGP at the Palmetto Facility and issued a Consent Order containing a monetary penalty against Defendant.

52. In 2015, the DEP once again found that Defendant failed to conduct certain analytical monitoring of storm water discharges required by the MSGP at the Palmetto Facility and issued a Consent Order containing a monetary penalty against Defendant.

53. After renewing its permit coverage once in 2010, the Palmetto Facility's coverage under the MSGP ultimately expired on September 27, 2015.

54. Defendant failed to submit a subsequent NOI to renew its permit coverage. Therefore, since September 27, 2015, Defendant has operated the Palmetto Facility without coverage under the MSGP or any individual NPDES permit.

**Defendant's Expired MSGP Coverage at the All Day Used Auto Parts Facility**

55. Defendant owns and/or operates an automobile salvage yard which does business as All Day Used Auto Parts and is located at 12710 Cairo Ln, Opa-locka, FL 33054 ("All Day Facility").

56. In 2003, Defendant sought permit coverage under the MSGP for its industrial storm water discharges at the All Day Facility.

57. The Facility ID for documents submitted to DEP for the All Day Facility was FLR05F736.

58. In 2004, the DEP conducted an inspection of the All Day Facility and observed an unprotected storm drain in the maintenance area surrounded by a heavily stained floor, a drum without secondary containment, and also found that there was no SWPPP developed for the facility.

59. In 2009, Defendant renewed its permit coverage for the All Day Facility. On its NOI, signed by Defendant on April 15, 2009, K.L. Brito certified that the Facility is classified under SIC Code 5015.

60. The NOI stated that the All Day Facility collects and discharges storm water through at least one discharge location (outfalls). Defendant certified that this outfall discharges to the Biscayne Canal.

61. In 2013, the DEP found that Defendant failed to conduct certain analytical monitoring of storm water discharges required by the MSGP at the All Day Facility and issued a

Consent Order containing a monetary penalty against Defendant.

62. The All Day Facility's coverage under the MSGP ultimately expired on April 17, 2014.

63. Defendant failed to submit a subsequent NOI to renew its permit coverage. Therefore, since April 17, 2014, Defendant has operated the All Day Facility without coverage under the MSGP or any individual NPDES permit.

### Facts Common to Defendants' Facilities

64. The majority of activities and storage at the Palmetto Facility and the All Day Facility (collectively "Facilities") takes place outdoors, where pollutants are exposed to storm water.

65. On information and belief, Plaintiff alleges that while the Palmetto Facility and All Day Facility have separate addresses, they are otherwise entirely coextensive.

66. A joint Facebook page for the Facilities indicates that they are open Monday through Saturday.

### Defendant Discharges Polluted Storm Water from the Facility into Waters of the United States

67. During precipitation events, storm water flows from the Facilities into an unnamed spur canal tributary to the Little River Canal, which flows into the Little River and then into Biscayne Bay (collectively "Receiving Waters").

68. The Receiving Waters are "waters of the United States."

69. On information and belief, Plaintiff alleges that Defendant's industrial activities at the Facilities have caused and continue to cause a "discharge of pollutants" within the meaning of CWA Section 502(12), 33 U.S.C. § 1362(12), and a "storm water discharge associated with industrial activity" within the meaning of 40 C.F.R. § 122.26(b)(14) from the Facilities on at

14

least each and every day that there has been a precipitation event greater than 0.1 inches. (EPA has determined that precipitation greater than 0.1 inches in a 24-hour period constitutes a measurable precipitation event for the purposes of evaluating storm water runoff associated with industrial activity. *See, e.g.*, 40 C.F.R. § 122.26(c)(i)(E)(6) (using 0.1 inches as the distinguishing threshold of a storm event)).

70. Because Defendant controls the industrial activities that take place at the Facilities, Defendant is responsible for managing storm water associated with those activities at the Facilities in compliance with the CWA.

71. Defendant is the person, as defined by CWA Section 502(5), 33 U.S.C. § 1362(5), responsible for the violations alleged in this Complaint.

## VI.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Unlawful Discharge of Pollutants Without a Permit**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

72. Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

73. CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

74. CWA Section 502(5), 33 U.S.C. § 1362(5), defines "person" to include "an individual, corporation, partnership [or] association."

75. CWA Section 502(12), 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

76. CWA Section 502(14), 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

77. CWA Section 502(7), 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

78. 40 C.F.R. § 120.2 defines "waters of the United States" to include, *inter alia*: "(1) Waters which are: (i) Currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (ii) The territorial seas; or (iii) Interstate waters . . . . (3) Tributaries of waters identified in paragraph (a)(1) or (2) of this section that are relatively permanent, standing or continuously flowing bodies of water; …. (4) Wetlands adjacent to the following waters: (i) Waters identified in paragraph (a)(1) of this section; or (ii) Relatively permanent, standing or continuously flowing bodies of water identified in paragraph (a)(2) or (a)(3) of this section and with a continuous surface connection to those waters."

79. CWA Section 402(p), 33 U.S.C. § 1342(p), and the implementing regulation found at 40 C.F.R. § 122.26(a)(1)(i) require facilities discharging storm water associated with industrial activity to obtain an NPDES permit.

80. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to abate its discharges of polluted storm water at the Facilities.

81. Defendant has discharged and continues to discharge storm water associated with industrial activity that contains pollutants from point sources to waters of the United States

without an NPDES permit.

82. Each and every day since at least July 16, 2018, on which Defendant discharges storm water associated with industrial activity at the Facilities without authorization under an NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

83. Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

84. Wherefore, Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION
**Failure to Apply for NPDES Permit Coverage**
**(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

85. Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

86. 40 C.F.R. § 122.26(c)(1) and 122.26(e)(1) require dischargers of storm water associated with industrial activity to apply for an individual permit or seek coverage under a promulgated storm water general permit by October 1, 1992.

87. Since at least July 16, 2018, Defendant has operated and continues to operate two facilities that engage in "industrial activity" as that term is defined in 40 C.F.R. § 122.26(b)(14).

88. Since that time, Defendant has routinely discharged polluted storm water associated with industrial activity from the Facilities to waters of the United States.

89. Therefore, since that time, Defendant has been obligated to apply for coverage under individual or general NPDES permits.

90. Once Defendant began discharging polluted storm water associated with industrial activity to waters of the United States, each and every subsequent day on which

Defendant failed to apply for permit coverage constitutes a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

91. Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

92. Wherefore, Plaintiff prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
### Failure to Implement Adequate Control Measures and Best Management Practices
### (Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)

93. Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

94. The MSGP's SWPPP requirements oblige Sector M dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

95. As evidenced, *inter alia*, by past finding of failures to implement sufficient BMPs, and a continued disregard of required monitoring obligations that would help assess the sufficiency on any implemented BMPs, Defendant has failed to implement BAT and BCT at the Facilities for its discharges in violation of Part XI.M of the MSGP.

96. Each day since at least July 16, 2018, that Defendant has failed to develop and implement BAT and BCT in violation of the MSGP is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

## VII.

## PRAYER FOR RELIEF

97. Wherefore, Plaintiff respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

18

a. Declare Defendant to have violated and to be in violation of the Clean Water Act as alleged herein;

b. Enjoin Defendant from discharging pollutants from the Facilities except as authorized by and in compliance with an NPDES permit;

c. Order Defendant to immediately apply for coverage under, and comply fully with all applicable requirements of, the MSGP (or an individual NPDES permit that is at least as stringent);

d. Order Defendant to take appropriate actions to remediate the harm caused by its violations of the MSGP and the Clean Water Act, to the extent possible;

e. Order Defendant to pay civil penalties, pursuant to CWA Sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d) and 1365(a), and by 40 C.F.R. §§ 19.1 – 19.4;

f. Order Defendant to pay the costs of litigation, including Plaintiff's reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

g. Award any such other and further relief as this Court may deem appropriate.

Dated this 14th day of September, 2023
Miami, Florida

Respectfully submitted,

By: /s/ Elizabeth Fata Carpenter

**Elizabeth Fata Carpenter**
elizabeth@evergladeslaw.org
Florida Bar No. 123542


**S. Ansley Samson**
ansley@evergladeslaw.org
Florida Bar No. 86398
EVERGLADES LAW CENTER, INC.
6815 Biscayne Blvd., Suite 103 #449
Miami, FL 33138
(786) 496-3309
*Attorneys for Plaintiff*